**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LERONE MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17-cv-6188 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CN TRANSPORTATION LIMITED, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the motion for summary judgment [34] filed by Defendant Illinois Central Railroad Company ("Defendant" or "Company"). For the reasons set forth below, the motion [34] is granted. Judgment shall be entered in favor of Defendant Illinois Central Railroad Company and against Plaintiff. Although CN Transportation Limited is listed as a Defendant on the docket, CN Transportation never answered or otherwise appeared in this matter. Plaintiff is given until January 14, 2020 to file a status report apprising the Court of the status of his claims against that Defendant.

**I.    Background**

**A.    Procedural History and General Background**

On August 25, 2017, Plaintiff Lerone Moore ("Moore") filed a complaint against Defendant alleging race discrimination and retaliation in violation of 42 U.S.C. § 1981. [41 (Stmt. of Add'l Facts), at ¶ 1.] Defendant is a rail carrier engaged in interstate commerce that does business in this District. [*Id*. at ¶ 3.] Defendant hired Plaintiff in May 2008 as a laborer/hostler. [*Id*. at ¶ 4.] Plaintiff worked in the Company's mechanical department at the Woodcrest Shop.

[*Id*. at ¶ 7.]  As a laborer in the mechanical department, Plaintiff was responsible for servicing and cleaning locomotives; transporting supplies and materials between works area and storage site; and performing a variety of support and clean-up activities for locomotive and car repair operations.  [*Id*. at ¶ 13.]  As a hostler, Plaintiff had a license to move locomotives within a certain area of the mechanical yard and was responsible for moving locomotives as instructed.  [*Id*. at ¶ 14.]

Laborers/hostlers like Plaintiff were directly supervised by front line supervisors/foremen, who reported to the general foreman.  [*Id*. at ¶ 8.]  The general foreman reported to the assistant manager of the shop.  [*Id*. at ¶ 9.]  From about 2010 until 2013, the assistant manager of the Woodcrest Shop was Kevin Gebhardt.  [*Id*.]  The assistant manager of the Woodcrest Shop reported directly to the manager of the Woodcrest Shop.  [*Id*. at ¶ 10.]  From 2011 to November of 2013, the manager of the Woodcrest Shop was Bryan Willis.  [*Id*.]  The manager of the Woodcrest Shop (and managers of other shops across the United States) reported to the assistant chief mechanical officer.  [*Id*. at ¶ 11.]  Phil Yourich was the assistant chief mechanical officer based out of Gary, Indiana, beginning in December 2012 until March 2018.  [*Id*.]  Willis reported directly to Yourich.  [*Id*.]  The assistant chief mechanical officer reported to the vice president of mechanical.  [*Id*. at ¶ 12.]  From approximately 2002 until September 2016, the vice president of mechanical was Jim Danielwicz.  [*Id*.]

**B.  Disciplinary Procedures and Attendance Rules**

Laborers/hostlers are members of the Fireman Oilers Union, subject to a collective bargaining agreement (the "CBA").  [*Id*. at ¶ 15.]  Discipline is administered to laborers/hostlers according to the provisions of the CBA.  [*Id*. at ¶ 16.]  Pursuant to the CBA, investigation hearings must occur before Defendant assesses discipline.  [*Id*.]  Investigation hearings are conducted by a

2

hearing officer and transcribed by a court reporter. [*Id*.] The purpose of an investigation hearing is to determine whether a rule violation has been committed. [*Id*.] Coaching letters may be issued without an investigation. [*Id*. at ¶ 17.] Typically, while Willis was the manager of the Woodcrest Shop, he would decide whether an investigation should be pursued in a given situation. [*Id*.] As manager, it was Willis's job to make a recommendation regarding discipline following an investigation. [*Id*. at ¶ 18.] Willis would generally review investigation transcripts after they were completed and, based on the transcript, determine whether disciplinary action was warranted. [*Id*.] If Willis believed disciplinary action appropriate, he would advise Yourich. [*Id*.] If Yourich agreed that discipline was warranted, he would advise Danielwicz of Willis's recommendation. [*Id*. at ¶ 19.] Yourich generally left the assessment of what level of discipline was appropriate in a given situation to Willis. [*Id*.]

Plaintiff received and was subject to the Mechanical/Material Department General Regulations. [*Id*. at ¶ 20.] Rule 17 applied to all employees at Woodcrest, including laborers and electricians. [41 (Stmt. of Add'l Facts), at ¶ 1.] Plaintiff understood that Rule 17 applied to him, as a member of the Mechanical Department. [36 (Stmt. of Facts), at ¶ 20.] Rule 17 reads:

> Employees must report for duty at the designated time and place with the necessary equipment to perform their duties and until the end of tour of duty. Those subject to call must not leave their usual calling place without notifying those required to call them, or leaving information as to where they can be located. Employees must not engage in other business, absent themselves from their duties during working hours * * * unless authorized to do so during assigned working hours. * * * Employees are required to work a scheduled 40-hour workweek as committed to in their respective collective bargaining agreements without excessive layoffs or absences. In cases of illness or other reasons of absence, employees must inform their supervisor by telephone at the earliest possible time, no later than their scheduled starting time[.]

[36 (Stmt. of Facts), at ¶ 20.] During Plaintiff's first term of employment and up until 2013, laborer/hostler attendance was monitored at the shop level. [*Id*. at ¶ 21.] Prior to May 1, 2013,

3

laborer/hostlers were required to call their direct supervisors (the foremen) to report absences. [*Id.* at ¶ 22.] Neither Gebhardt nor Willis would review employees' attendance records unless someone reported an issue. [44-4 (Gebhardt Dep. Tr.), at 20; 44-1 (Willis Dep. Tr.), at 13-14.] While looking into an employee's attendance records for disciplinary purposes, the standard practice while Willis was manager of Woodcrest was to review the preceding ninety days in light of Rule 17. [36 (Stmt. of Facts), at ¶ 22.]

In 2013, Defendant established the Attendance Management Center ("AMC"). [*Id.* at ¶ 23.] The AMC began operation on May 1, 2013. [*Id.*] As of that date, new attendance guidelines were effective (the "AMC Guidelines"), and all unionized employees at the Company were expected to call the AMC to report absences. [*Id.*] Both before and after the AMC was created, a supervisor could give an employee permission to be off work. [*Id.* at ¶ 24.] A doctor's note, however, would not automatically excuse an absence. [*Id.*] Mechanical supervisor Janet Washington posted information about the new guidelines and call-in procedure throughout the Woodcrest Shop. [*Id.* at ¶ 25.] Plaintiff was aware of the new requirements. [*Id.*] Pursuant to the AMC Guidelines, employee attendance was subject to review, investigation, and corrective action if, within a twelve-week period, an employee accrued more than two unexcused absences of any duration, missed more than three work days without approval, or had more than one unexcused absence on a holiday or immediately before or after a holiday, rest day, Personal Leave Day, vacation day, or FMLA day. [*Id.* at ¶ 26.] Corrective action guidelines ("CA Guidelines") associated with the AMC were implemented beginning on May 24, 2013. [*Id.* at ¶ 27.] The CA Guidelines stated that the Company would "consider the employee's entire disciplinary record when issuing discipline for an established violation of these Guidelines" and provided recommended progressive corrective actions for employees who had no existing discipline on their

records. [*Id.*] The CA Guidelines further provide that "[a]n employee is subject to review, investigation and/or correction if unexcused absences reach any of the following levels during any 12-week period: [1] More than 2 occurrences of any duration, [2] more than 3 total work days missed, [or] [3] more than 1 occurrence that is on a holiday or immediately before or after a holiday, rest day, Personal Leave Day (PLD), vacation day, or Family Medical Leave Act (FMLA) day." [37-2 (Moore Ex. 33), at 32.] The guidelines supplemented, but did not replace, Rule 17. [36 (Stmt. of Facts), at ¶ 28.] After the AMC was created, all violations of AMC Guidelines were considered "excessive" under Rule 17. [*Id.* at ¶ 28.] After the AMC began operations, the AMC would alert Woodcrest management to attendance issues, typically by sending an email to management regarding each violation of a Guideline. [*Id.* at ¶ 29.]

Willis had discretion to decide not to impose discipline under the Guidelines. [41 (Stmt. of Add'l Facts), at ¶ 29.] Willis testified that, under Rule 17, employees could be disciplined for approved absences if the employee's absences were excessive. [*Id.*] When asked whether he would be less likely to discipline someone who was absent for a legitimate reason, Willis testified that it would depend on the situation and that he would use his discretion to determine what was legitimate. [*Id.*] Gebhardt testified that absences covered under the FMLA and absences due to being subpoenaed were not counted against employees under Rule 17.[1] [*Id.*] He also said that absences shown in an employee's records because the employee worked as a relief supervisor would not be counted against them. [*Id.*] Before the AMC Guidelines were put into place, Willis considered absences of around 40 hours over a 90-day period to be excessive under Rule 17. [*Id.* at ¶ 30.] Willis also testified that 48 hours of absences in 90 days could be tolerable or excessive depending on the circumstances. [*Id.*]

---

[1] As noted by Defendant, absences that had proper approval also were not counted. [37-9, at 5.]

Washington testified that—before the AMC Guidelines were put into place—employees would be given a verbal warning if they were absent a certain number of hours (she believed the threshold was 48 hours) during a 90-day period. [*Id*. at ¶ 6.] If the verbal warning did not correct the problem, they would move on to a letter to the employee's file, followed by an investigation. [*Id*.] Gebhardt testified that he believed this testimony was accurate. [44-4 (Gebhardt Dep. Tr.), at 91.]

### C. Plaintiff's History with Attendance Issues

In July 2008, Plaintiff received an evaluation from foreman Steve Fedro, which noted that "absenteeism is not dealt with lightly." [36 (Stmt. of Facts), at ¶ 30.] Fedro rated Plaintiff's "On Time Reporting" a 1 out of 5, meaning "poor," the lowest possible score. [*Id*.] Plaintiff admits that he was "probably" having absenteeism issues in the summer of 2008. [*Id*.] On April 8, 2009, Brad Robertson, then manager of the Woodcrest Shop, issued Plaintiff a letter informing him that Defendant considered his record of absenteeism over the preceding ninety days excessive and unacceptable in violation of Rule 17. [*Id*. at ¶ 31.] During the ninety-day period in question, Plaintiff had been absent five days and missed another 14.88 hours of work due to arriving late or leaving early. [*Id*.] The letter informed Plaintiff that he was expected to improve his attendance record immediately to avoid disciplinary action. [*Id*.] Plaintiff admits that he had attendance issues at the time this letter was issued. [*Id*.] On July 14, 2010, Kenneth Karlin, then manager of the Woodcrest Shop, met with Plaintiff to discuss his failure to properly notify his supervisor of his absences on several occasions. [*Id*. at ¶ 32.] After the meeting, Karlin issued Plaintiff a letter

counseling him on the subject.  [*Id*.]  The letter specifically reminded Plaintiff that employees were expected to "work regularly without excessive layoff or absences" under Rule 17.  [*Id*.]

From August 7-13, 2010, Plaintiff was absent from work for five consecutive days without permission.[2]  [*Id*. at ¶ 33.]  Pursuant to Rule 27 of the CBA, on August 13, 2010, Plaintiff was deemed to have abandoned his job and was separated from employment.  [*Id*.]  Gebhardt issued Plaintiff a letter informing Plaintiff of this fact.  [*Id*.]  Plaintiff challenged his separation through the Union and sought reinstatement through a neutral arbitration before the Public Law Board ("PLB").  [*Id*.]  As ordered by the arbitrator, Defendant reinstated Plaintiff on a last-chance basis. [*Id*. at ¶ 35.]  Plaintiff understood that the "last chance admonition" in the PLB order meant that further absenteeism would result in the termination of his employment.  [*Id*.]

### D.    2012 Cautionary Letter and Human Resources Complaint

On March 20, 2012, foreman Sean Moran issued Plaintiff a cautionary letter.  [*Id*. at ¶ 36.] The letter noted that Plaintiff moved two locomotives to the wrong location.  [*Id*.]  When asked to move them to the correct location, Plaintiff repeatedly argued with Moran about the instruction.

---

[2] Although Plaintiff admits this fact, Plaintiff's Statement of Additional Facts asserts that his foreman approved his time off because he was not able to work due to his impacted wisdom teeth.  [41 (Stmt. of Add'l Facts), at ¶ 31.]  Plaintiff also testified that, at the investigation hearing, he presented a doctor's note showing that he went to the emergency room and phone records showing that he called Defendant on the days he was absent.  [*Id*.]  But Plaintiff claims that he no longer has that evidence.  [44-7 (Pl.'s Dep. Tr.), at 176.]  Given that the arbitrator who ordered Plaintiff's reinstatement stated that "the record" before him did "not contain any evidence to substantiate that [Plaintiff] had permission to be absent or the reasons for his absence" [37-2 (Moore Ex. 26), at 22], Plaintiff's testimony on this point is highly suspect.  Plaintiff does not explain how he lost the evidence referenced in his testimony.  Furthermore, the Court sees no reason why the neutral arbitrator would misrepresent the evidence presented by Plaintiff.  Given the centrality of the evidence, it is highly implausible that the arbitrator overlooked that evidence.  Plaintiff cannot survive summary judgment "where his recollection is flatly refuted by other evidence in the record, or his story is so internally inconsistent or implausible on its face that no reasonable person would believe it."  *Melton v. Tippecanoe Cty.*, 838 F.3d 814, 819 (7th Cir. 2016).  Plaintiff's testimony that he presented evidence establishing that his absences were excused satisfies this standard and therefore will not be credited.  Even if the Court credited Plaintiff's testimony, however, the result would still be the same, because any claim based on this conduct is time-barred for the reasons discussed below.

[*Id*.]  Additionally, the letter noted that Plaintiff refused a directive from his supervisor to return paperwork to him.  [*Id*.]  Plaintiff was notified that this behavior "constitute[d] insubordination and [would] not be tolerated."  [*Id*.]  Plaintiff testified that he believed Moran issued this letter pursuant to a directive from management to retaliate against and mistreat Plaintiff.  [*Id*.]

On May 22 or 23, 2012,[3] Plaintiff called human resources and lodged a complaint regarding foreman Joe Jackson.  [*Id*.]  Plaintiff spoke to human resources associate Veronica Loewy and complained that Jackson had been "threatening," "cursing," and "yelling" at him.  [*Id*.]  Plaintiff reported that he felt he was harassed, discriminated against, and retaliated against by Jackson.  [*Id*.] He also reported that he felt Jackson was trying to get him fired.  [*Id*.]  Plaintiff informed Loewy that this was the second time Jackson hollered at him.  [*Id*.]  Plaintiff told Loewy that Jackson was upset because Plaintiff did not immediately move a locomotive as Jackson requested.  [*Id*.] Instead, Plaintiff told Jackson that he would have to be put on a list because Plaintiff was in the middle of moving a different locomotive.  [*Id*. at ¶ 38.]  Plaintiff reported to Loewy that he heard from a coworker that Jackson referred to Plaintiff as a "smart talking little bitch."  [*Id*.]  Plaintiff told Loewy that Jackson (without any witnesses around) cursed and "hollered at" Plaintiff.  [*Id*.] Plaintiff testified at deposition that he believes Jackson's conduct was both retaliation and racial discrimination, and that Jackson was acting on a directive from management to mistreat Plaintiff due to his race.  [*Id*. at ¶ 39.]  Plaintiff never expressed this belief to Loewy.  [*Id*.]  Jackson is African-American.  [*Id*.]

Loewy investigated Plaintiff's complaints and concluded that there was no violation of the Company Prohibited Harassment, Discrimination, and Anti-Retaliation Policy.  [*Id*. at ¶ 40.]

---

[3] Plaintiff alleged in his complaint that he raised a complaint to HR in 2013, but Plaintiff clarified in his deposition that he actually raised the complaint in 2012. [Id. at ¶ 37.]

Plaintiff was provided with a letter dated June 4, 2012 informing him of the same.  [*Id.*]  The letter also stated:

> [The Company] takes complaints of harassment, discrimination or retaliation very seriously and is fully committed to providing a work environment that is free of unlawful harassment, discrimination and retaliation.  We maintain a strict policy prohibiting unlawful harassment and discrimination and any other legally protected status.  Also, [the Company's] policies provide for the reporting of complaints regarding potential violations of its policies. IC prohibits and will not tolerate retaliation for filing a complaint or participating in the investigation of a complaint.

[*Id.*]  The letter informed Plaintiff that Defendant expected him to report any suspected retaliation immediately so that the Company could address it and supplied him with a phone number to use in order to do so.  [*Id.*]

### E.    Plaintiff's 2012 Medical Leave

Plaintiff went on approved medical leave for substance abuse treatment in late June 2012. [*Id.* at ¶ 41.]  On July 5, 2012, Defendant issued a notice of investigation signed by Gebhardt regarding Plaintiff's apparent absences from work without permission from June 23-26, 2012 and for failing to work on a regular basis following his reinstatement.  [*Id.*]  On July 25, 2012, Willis sent an email to Yourich requesting permission to terminate Plaintiff's employment due to his record of absenteeism and because he did not attend the investigation hearing.  [45-2 (Yourich Ex. 18), at 25.]  However, when Plaintiff returned from chemical dependency treatment, he provided Gebhardt with documentation relating to his absences and no disciplinary action was taken.  [36 (Stmt. of Facts), at ¶ 42; see also 44-3 (Willis Dep. Tr.), at 97-98.]  On July 26, 2012, labor relations manager Karen McCarthy sent an email to Washington, Willis, and Gebhardt stating: "it is doubtful an arbitrator would uphold any discipline since we denied the Organization's request for a postponement, we proceeded despite Plaintiff's absence on a qualified medical leave from June 27 through July 27, 2012 as evidenced by the notice sent to Kevin and Janet on July 5, 2012, and

he was not medically fit to attend the hearing." [41 (Stmt. of Add'l Facts), at ¶ 9.] The parties dispute whether Gebhardt was aware that Plaintiff was in chemical dependency treatment and had approval to be away from work. [36 (Stmt. of Facts), at ¶ 42.] For the purposes of this motion, the Court assumes that Gebhardt was aware of that fact.

### F.  Running a Switch Investigation

On March 19, 2013, Plaintiff failed to stop within half the line of sight to a switch. [*Id*. at ¶ 43.] The first two wheels of the locomotive he was driving slid through a switch causing the switch to break. [*Id*.] A switch is a piece of track that can be moved in order to change which track a locomotive or train will go on. [*Id*. at ¶ 44.] When a locomotive or train goes through a switch that is not properly lined up to the intended track, it is referred to as "running a switch." [*Id*.] Running a switch damages the switch and can cause the locomotive or train to derail. [*Id*.] There are many circumstances that are relevant to determining what disciplinary action is appropriate when an employee is involved in running a switch. [*Id*.] On March 21, 2013, a notice of investigation signed by Gebhardt was issued to Plaintiff. [*Id*. at ¶ 45.] The investigation was intended to determine Plaintiff's responsibility for allegedly exceeding yard speed limits and failing to stop a locomotive within half the line of sight to the switch, causing the locomotive to run through the switch on March 19, 2013. [*Id*.] Plaintiff was pulled out of service pending investigation. [*Id*.]

According to Gebhardt, employees could be taken out of service pending an investigation hearing if they tested positive for intoxicants or drugs while on duty, committed theft of company property, committed gross insubordination, or vicious conduct, or while the results of a drug or alcohol screening were pending. [41 (Stmt. of Add'l Facts), at ¶ 13.] Gebhardt could not think of other reasons. [50 (Resp. to Stmt. of Add'l Facts), at ¶ 19.] Plaintiff did not test positive for

intoxicants or drugs after the March 19, 2013 incident, and his negative alcohol and drug test results came back within 72 hours. [41 (Stmt. of Add'l Facts), at ¶ 19.] Plaintiff did not engage in any gross insubordination in connection with the March 19, 2013 incident. [*Id*.] Plaintiff did not engage in any vicious conduct in connection with the March 19, 2013 incident. [*Id*.] Plaintiff was not accused of theft of company property. [*Id*.] Nevertheless, Gebhardt ordered Plaintiff to be pulled out of service after the March 19, 2013 incident. [*Id*. at 20.] When asked why he ordered Plaintiff to be pulled out of service, he testified "best recollection would be having the results from the urinalysis and alcohol screening." [*Id*.] However, Gebhardt did not know how long the screening process took or whether he was still waiting to get the results of the test as of April 11, 2013. [*Id*.] Plaintiff's negative alcohol and drug tests came back within 72 hours of the incident. [41 (Stmt. of Add'l Facts), at ¶ 19.]

An investigation into Plaintiff's alleged conduct on March 19, 2013, was held on April 11, 2013. [36 (Stmt. of Facts), at ¶ 46.] Gebhardt served as the hearing officer. [*Id*.] Plaintiff was issued a thirty-day suspension as a result of the investigation. [*Id*.] During the investigation hearing on April 11, 2013, Plaintiff stated:

> I've been here since 2008, and I really–there's not a day that has gone by that I feel that I have worked because I love my job so much. I really enjoy doing what I do. I really enjoy the people that I work with and around and people outside of my–outside of the mechanical shop.
>
> With that being said, I also feel that I am being discriminated against and retaliated against due to the fact of past–of my past with this company, but I've also tried to right the wrongs that was happening with my past, and it shows with my–I'm no longer an unfocused employee as to absenteeism.

[*Id*. at ¶ 47.] During the investigation hearing on April 11, 2013, Plaintiff claimed that two other laborer/hostlers—Jerry Adcock and Tim Swanson—had run through switches recently, but that neither had been disciplined. [*Id*. at ¶ 48.] Plaintiff claimed that Swanson had received only a

letter of caution in his file and that Adcock had received nothing. [*Id.*] However, Plaintiff did not have firsthand knowledge of the incident. Rather, Plaintiff was told that Adcock and Swanson ran through switches by another laborer, George Groll. [41 (Stmt. of Add'l Facts), at ¶ 14.] Gebhardt responded that he was unaware of Adcock or Swanson running through switches and asked Plaintiff to provide information about the alleged incidents, such that he could investigate them. [36 (Stmt. of Facts), at ¶ 48.] Plaintiff never brought Gebhardt any such information. [*Id.*]

Gebhardt issued a letter of caution to Swanson on or about December 10, 2012, in which Gebhardt stated: "It is imperative that you pay attention to all switches prior to proceeding through. This Letter of Caution is also to inform you that in the future I will expect you to ensure proper alignment of all switches prior to proceeding through them." [41 (Stmt. of Add'l Facts), at ¶ 13.] Gebhardt testified that he did not recall the incident that prompted the letter of caution. [*Id.*] Plaintiff testified that anytime a switch was broken it had to be reported on the turnover log. [44-7 (Pl.'s Dep. Tr.), at 59.] Although a turnover log dated March 6, 2013 indicates that the switch was in bad order and would not close all the way, the log does not indicate the cause. [45-3 (Moore Ex. 31), at 3.] Groll also testified at the investigation hearing. Although Groll testified that he was aware that someone ran a switch and broke it on or about March 7, 2013, Groll did not testify that he knew who ran the switch. [45-1 (Yourich Ex. 4), at 11.] Willis did not investigate whether Adcock or Swanson had run a switch. [41 (Stmt. of Add'l Facts), at ¶ 12.] Neither Gebhardt nor Danielwicz recalled doing any investigation into whether Adcock had run a switch. [*Id.*] Yourich also testified that he did not investigate whether Adcock had run a switch. [*Id.*] According to Yourich, that would have been the job of the assistant manager or the manager of the shop. [*Id.*]

After the April 11, 2013 hearing, Gebhardt issued a recommendation to suspend Plaintiff for thirty days in connection with the March 19, 2013 incident. [44-4 (Gebhardt Dep. Tr.), at 52-

53.] Yourich approved the recommendation to suspend Plaintiff for thirty days for running a switch and damaging it. [41 (Stmt. of Add'l Facts), at ¶ 11; 37-2 (Moore Dep. Ex. 32), at 29.] Yourich testified that Willis would have contacted him to discuss the recommendation and that Yourich would have consulted Danielwicz for final approval, even though Yourich could not recall doing so in this particular instance. [41 (Stmt. of Add'l Facts), at ¶ 11.]

Danielwicz approved the recommendation to issue Plaintiff a thirty-day suspension based on the findings, but Danielwicz does not recall receiving the recommendation. [36 (Stmt. of Facts), at ¶ 49.] It is unclear what role the thirty-day suspension played in the decision to terminate Plaintiff's employment. Although Danielwicz testified that it is possible that Plaintiff would have been terminated even if he had not been disciplined for running the switch [44-6 (Danielwicz Dep. Tr.), at 63-64], Danielwicz also testified that he relied on information provided in a September 6, 2013 email from Yourich discussing the switch incident. [*Id*. at 16-17.] Danielwicz further testified that it is possible that Plaintiff running the switch could have played a role in his decision to approve the termination of Plaintiff. [*Id*. at 17.]

### G.     August 2013 Investigation and Termination

On August 12, 2013, the AMC sent an attendance violation alert email regarding Plaintiff to Gebhardt and Washington. [*Id*. at ¶ 50.] The email informed Gebhardt and Washington that Plaintiff had "exceeded a threshold of the attendance guidelines by having more than two occurrences of any duration." [*Id*.] The letter stated that, "if the employee has no discipline on record, a coaching session followed up by a coaching letter" is recommended. [*Id*.] On August 20, 2013, an investigation notice signed by Gebhardt was issued, scheduling an investigation hearing to determine whether Plaintiff violated company rules, regulations, or policies by missing 37.58 hours of work over the preceding ninety days. [*Id*. at ¶ 51.] Although Gebhardt testified

that he could not say whether he was the one who decided to hold the investigation, he also testified that he believed that Plaintiff missing 37.58 hours of work in a 90-day period warranted an investigation because it was "almost a whole week's worth of work" that Plaintiff missed. [44-4 (Gebhardt Dep. Tr.), at 66.]

The investigation hearing was held on August 27, 2013. [36 (Stmt. of Facts), at ¶ 51.] Washington (who also was assistant to Gebhardt) sat in on the August 27, 2013 investigation hearing on Willis's behalf. [41 (Stmt. of Add'l Facts), at ¶ 24.] Plaintiff was given the opportunity to explain each absence without permission, which were on May 22, June 19, June 26, July 6, July 13, August 6, August 10, and August 14, 2013. [36 (Stmt. of Facts), at ¶ 52.] Plaintiff was absent on May 22, 2013 because he was sick,[4] but illness was not excused under Defendant's policy at the time. [*Id.* at ¶ 53.] Plaintiff was absent on June 26, 2013 because he had to go to court to testify as a witness to an aggravated assault.[5] [*Id.* at ¶ 55.] Plaintiff left work four hours early on July 10, 2013 because he was sick. [*Id.* at ¶ 56.] Plaintiff was absent on July 13, 2013, because he was at the hospital. [*Id.* at ¶ 57.] Although Plaintiff provided a doctor's note for this absence, a doctor's note does not automatically excuse an absence. [*Id.*] Plaintiff missed work on August 6, 2013 because his brother was shot. [*Id.* at ¶ 58.] Plaintiff was late to work on August 10, 2013 because he missed his train. [*Id.* at ¶ 59.] Willis considered all of these absences in deciding what action to take after the investigation concluded. With respect to Plaintiff's absence on August 6, 2013, Willis testified that he disputed that Plaintiff called in to report his absence on August 6,

---

[4] Defendant does not identify any reason for questioning Plaintiff's representations regarding the reasons for his absences. Furthermore, on Defendant's motion for summary judgment, the Court construes all facts in the light most favorable to Plaintiff and draws all reasonable inferences in his favor. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). The Court therefore proceeds on the assumption that Plaintiff's representations were truthful.

[5] There is no evidence before the Court indicating that Plaintiff was subpoenaed or otherwise ordered by a court to testify.

2013—the day Plaintiff took off because his brother was shot because an unknown person wrote "no call/no show?" on the time sheet for that day next to Plaintiff's name. [41 (Stmt. of Add'l Facts), at ¶ 26.] Although Plaintiff stated at the August 27, 2013 hearing that he called into the AMC Center and also notified supervisor Bill Beauchamp of his need to be absent, Willis could not recall whether he asked Beauchamp if Plaintiff called in to report that absence. [*Id*.] Although Willis and Yourich testified that an absence due to an employee's brother being shot might be excused or violate a last chance agreement depending on the circumstances, neither Willis nor Yourich did any follow up to get more information surrounding the circumstances of that absence. [*Id*. at ¶ 27.] Because Willis did not consider Plaintiff's other absences in deciding what action to take after the investigation concluded [36 (Stmt. of Facts), at ¶¶ 54, 60], the Court will not address them here.

After the investigation, Willis made the recommendation to Yourich that Plaintiff's employment be terminated. [*Id*. at ¶ 61.] Willis did not consult Gebhardt about whether he felt Plaintiff's employment should be terminated. [*Id*.] Willis submitted an affidavit representing that he would have recommended termination regardless of the thirty-day suspension.[6] [37-9 (Willis Decl.), at ¶ 6.] Willis was aware of the Last Chance Order when he made his recommendation.[7] [*Id*. at ¶ 8.] On September 6, 2013, Yourich sent Danielwicz an email requesting authority to terminate Plaintiff's employment, which Danielwicz granted. [36 (Stmt. of Facts), at ¶ 62.] On September 10, 2013, Plaintiff was issued a letter signed by Willis terminating Plaintiff's employment. [*Id*. at ¶ 63.] The letter stated that Willis had "reviewed the transcript of the formal

---

[6] Defendant objects to this assertion as speculation. While this opinion involves a hypothetical, not all hypotheticals are improper speculation. Willis has first-hand knowledge of his reasons for recommending termination and is able to testify regarding the reasons for his decision.

[7] Although Plaintiff disputes this assertion, he does not cite to any admissible evidence supporting that position. The Court therefore credits Willis's representation.

investigation, which was held on August 27, 2013," and determined that "the record contains credible testimony and substantial evidence" showing that Plaintiff violated Rule 17 and the Last Chance Order. [*Id.*] Plaintiff challenged his termination through the Union. [*Id.* at ¶ 65.] A neutral arbitration was held before the PLB. [*Id.*] This time, the arbitrator determined that Plaintiff's absenteeism exceeded allowable limits and upheld the termination of Plaintiff's employment. [*Id.*]

Willis and Yourich testified that the only specific problem with Plaintiff's work performance was his attendance. [41 (Stmt. of Add'l Facts), at ¶ 21.] Gebhardt also testified that Plaintiff was not a good employee and that Gebhardt's "supervisors had to continually get after [Plaintiff] * * * to do his job. They could never find him when they were looking for him." [44-4 (Gebhardt Dep. Tr.), at 166.]

## I. Comparators

### i. *James A. Wright, Sr. (Caucasian)*

James A. Wright, Sr. ("Wright Sr.") had a total of 64.65 hours of absences that were not covered by PTO, sick time, and were not part of a protected leave during the period of July 1, 2012 through September 29, 2012. [41 (Stmt. of Add'l Facts), at ¶ 40.] Wright Sr. had a total of 42.25 hours of absences that were not covered by PTO, sick time, and were not part of a protected leave during the period of September 30, 2012 through December 29, 2012. [*Id.* at ¶ 41.] Although Wright Sr. received a non-disciplinary letter of caution for exceeding attendance thresholds on or about August 18, 2015, he was not disciplined for absenteeism between 2010 and 2015. [*Id.* at ¶ 42.] No investigation was done into whether Wright Sr. had excessive absenteeism in 2012 or 2013. [*Id.*]

        ii.     *James E. Wright, Jr. (Caucasian)*

James E. Wright, Jr. ("Wright Jr.") had a total of 37.6 hours of absences that were not covered by PTO, sick time, and were not part of a protected leave during the period of July 1, 2012 through September 29, 2012. [41 (Stmt. of Add'l Facts), at ¶ 34.] He had a total of 45.5 hours of absences that were not covered by PTO, sick time, and were not part of a protected leave during the period of September 30, 2012 through December 29, 2012. [*Id*. at ¶ 35.] He had a total of 57 hours of absences that were not covered by PTO, sick time, and were not part of a protected leave during the 90-day period of December 30, 2012 through March 30, 2013. [*Id*. at ¶ 36.] But he did not receive any discipline for absenteeism between 2010 and 2014. [*Id*. at ¶ 37.] Wright Jr. received a nondisciplinary letter of caution from Kevin Gebhardt on or about August 2, 2013 for absences on June 1, 2013, June 19, 2013, and July 21, 2013, which were reported by the AMC on July 25, 2013. [*Id*.] There is no evidence that Wright Jr. had any coaching or discipline for attendance on his record at the time the AMC notice was issued. [36 (Stmt. of Facts), at ¶ 77.]

In the 90-day period prior to the July 25, 2013 AMC notification that was issued to Gebhardt regarding Wright Jr., he had 49 hours of absences that were not covered by PTO, sick time, and were not part of a protected leave. [41 (Stmt. of Add'l Facts), at ¶ 38.] Wright Jr. received a 5-day deferred suspension for his second AMC violation. [*Id*. at ¶ 39.] The AMC issued a notice of a third violation by Wright Jr. on April 1, 2015. [*Id*.] No action was taken on this third violation, allegedly because the company missed the 21-day deadline to issue a notice of investigation. [*Id*.]

        iii.     *Scott Szelinski (Caucasian)*

Scott Szelinski received counseling after management received notice of his first violation of the AMC Guidelines on or about November 17, 2014. [36 (Stmt. of Facts), at ¶ 77; 41 (Stmt.

of Add'l Facts), at ¶ 52.] There is no evidence that Szelinski had any coaching or discipline for attendance on his record at the time this AMC notice was issued. [36 (Stmt. of Facts), at ¶ 77.] After later attendance infractions, Defendant scheduled an investigation hearing for Szelinski on June 16, 2015. [41 (Stmt. of Add'l Facts), at ¶ 49.] The investigation hearing related to (1) Szelinski's absences on June 7-8, 2015, also considering Szelinski's attendance records for the preceding twelve-week period, and (2) Szelinski's purported false statements to the AMC regarding his rest days. [45-2 (Yourich Dep. Ex. 25), at 55.] Plaintiff contends that Szelinski had two previous attendance violations, which were brought to Gebhardt's attention in emails from the AMC on January 26, 2015, February 8, 2015, and June 8, 2015, that were not pursued. [41 (Stmt. of Add'l Facts), at ¶ 49.]

Although Plaintiff cites to the June 8, 2015 email, Plaintiff also cites to Exhibit 27 from Yourich's deposition [*id.*], but that exhibit is not in the materials before the Court. The June 8, 2015 email from AMC does indicate that violation 1 and violation 2 were not pursued, but there is no additional evidence before the Court regarding the circumstances of those supposed violations or why they were not pursued. Given that Plaintiff admits that Szelinski received counseling after management received notice of his first violation, it cannot be the case that Defendant took *no action* in response to the first violation. Defendant asserts that Szelinski received a letter of caution as a result of the second violation, but Defendant cites to its own interrogatory response in support of that assertion (without any pincite). Defendant cannot rely on its own answers to interrogatories—which constitute inadmissible hearsay—to support its motion for summary judgment. *Luster v. Illinois Dep't of Corr.*, 652 F.3d 726, 731 n.2 (7th Cir. 2011). Thus, although it is clear that Szelinski received counseling after his first violation, it is unclear from the parties' submissions how Defendant handled Szelinski's second violation. For the

18

purposes of this motion, the Court assumes that Defendant took no action in response to Szelinski's second violation. With respect to Szelinski's third violation, he received a thirty-day suspension as discipline for his attendance infractions and his dishonesty with the AMC after he requested a waiver of investigation. [41 (Stmt. of Add'l Facts), at ¶¶ 50-51.] There is no evidence before the Court indicating that Plaintiff ever requested a waiver of investigation. Nor is there any evidence that the union ever requested a waiver of investigation on Plaintiff's behalf.

#### iv. Steven Simmons (Caucasian)

In 2013, Willis recommended that another laborer/hostler Steve Simmons be terminated for attendance issues. [36 (Stmt. of Facts), at ¶ 66.] Simmons was terminated effective January 28, 2013. [Id.] Simmons was not on a last chance order at the time of his termination. [Id.] Simmons was in Willis's and Gebhardt's reporting structure. [41 (Stmt. of Add'l Facts), at ¶ 45.] Prior to his January 28, 2013 termination, Simmons received a suspension for unauthorized absenteeism and numerous letters of caution for excessive absenteeism and failure to report to work going back to 2007. [Id.] In the summer of 2012, Willis[8] had a conversation with Steve Simmons about concerns regarding his attendance. [Id. at ¶ 46.] During the conversation, they discussed making sure Simmons was on time, not calling off, and being at work as much as possible. [Id.] Willis never spoke to Plaintiff about his attendance before Plaintiff was terminated in 2013. [Id. at ¶ 47.]

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable

---

[8] Plaintiff's Statement of Additional Fact No. 46 indicates that Simmons had a conversation with Simmons. The cited materials, however, indicates that it was Willis who spoke with Simmons.

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (quoting *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

With each motion for summary judgment filed pursuant to Rule 56 "the moving party shall serve and file—(1) any affidavits and other materials referred to in Fed. R. Civ. P. 56(e); (2) a supporting memorandum of law; and (3) a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law[.]" LR 56.1 (N.D. Ill.). The statement of material facts "shall consist of short numbered

paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion." *Id.*

"Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp.*, 477 U.S. at 323. In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III.    Analysis

### A.    Statute of Limitations

To the extent that Plaintiff's claims are based on events that occurred before August 25, 2013, Defendant moves for summary judgment on Plaintiff's claims as time-barred. Plaintiff filed his complaint on August 25, 2017, asserting race discrimination and retaliation claims under 42 U.S.C. § 1981. "Section 1981 claims must be filed within four years of the alleged discriminatory act." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 891 (7th Cir. 2016) (citing 28 U.S.C. § 1658; *Campbell v. Forest Pres. Dist. of Cook Cty., Ill.*, 752 F.3d 665, 667-68 (7th Cir. 2014)). Thus, Defendant argues that all claims based on events that occurred more than four years before Plaintiff filed his complaint (*i.e.*, August 25, 2013) are time-barred. Plaintiff does not dispute that claims

21

based on events that occurred before August 25, 2013 are time-barred. Plaintiff notes, however, that "[i]t is well settled that evidence of earlier discriminatory conduct by an employer that is time-barred is nevertheless entirely appropriate evidence to help prove a timely claim based on subsequent discriminatory conduct by the employer." *Mathewson v. Nat'l Automatic Tool Co.*, 807 F.2d 87, 91 (7th Cir. 1986). Thus, to the extent that Plaintiff seeks to bring claims based on conduct occurring before August 25, 2013, Plaintiff's claims are time-barred. However, the Court still will consider conduct occurring before that date, to the extent that such conduct is evidence of a later discriminatory intent.

### B.      Race Discrimination Claim

Defendant moves for summary judgment on Plaintiff's race discrimination claim. Plaintiff argues that he has established his claim of racial discrimination under the burden-shifting framework established by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under the *McDonnell-Douglas* burden-shifting framework, "the plaintiff must show evidence that '(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably.'" *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018) (quoting *Carson v. Lake Cty., Indiana*, 865 F.3d 526, 533 (7th Cir. 2017)). "If the plaintiff has established this prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (internal quotation marks and citation omitted). Defendant concedes that Plaintiff is a member of a protected class and that he suffered from an adverse

employment action. However, Defendant argues that Plaintiff's race discrimination claim fails in all other respects.

### i. *Employer's Legitimate Expectations*

Defendant argues that Plaintiff cannot establish that he was meeting Defendant's legitimate employment expectations with respect to his attendance. "It should not require saying that generally attendance is a requirement of a job." *Waggoner v. Olin Corp.*, 169 F.3d 481, 483 (7th Cir. 1999). The Seventh Circuit therefore has consistently held that employees who violate their employer's attendance guidelines are not meeting their employer's legitimate expectations. See, *e.g., Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014). Plaintiff argues that he was meeting Defendant's legitimate expectations with respect to his attendance because— according to Plaintiff—his absences were not excessive under Defendant's own standards. In support of this assertion, Plaintiff cites to testimony indicating that the threshold for excessive absenteeism was around 40 hours (or possibly as much as 48 hours) in a 90-day period. Plaintiff only had 37.58 hours of absences within the 90 days before the August 27, 2013 investigation notice.

However, what qualified as excessive absenteeism changed during the course of Plaintiff's employment. Before the AMC Guidelines were put into place, Willis considered absences of around 40 hours over a 90-day period to be excessive under Rule 17. [41 (Stmt. of Add'l Facts), at ¶ 5.] Willis also testified that 48 hours of absences in 90 days could be tolerable or excessive depending on the circumstances. [*Id*.] After the AMC was created, all violations of AMC Guidelines were considered "excessive" under Rule 17. [41 (Stmt. of Add'l Facts), at ¶ 28.] Although Danielwicz testified that Plaintiff's 32 hours of absences reflected on his 2013

attendance records were not excessive,[9] Gebhardt testified that the absences in Plaintiff's 2013 attendance record were problematic not because they were excessive, but because they violated the AMC Guidelines. [44-4 (Gebhardt Dep. Tr.), at 98-102.] The Court recognizes that there is some confusion regarding the term "excessive" because it is not used consistently by the witnesses. Specifically, the testimony of Danielwicz and Gebhardt indicate that Plaintiff violated the AMC Guidelines but that Plaintiff's absences were not excessive. Given that all violations of the AMC Guidelines are considered excessive under Rule 17, there is an internal inconsistency with this testimony. Still, Willis submitted a declaration representing that the investigation into Plaintiff's attendance record revealed that Plaintiff did not have permission to be absent and that his unexcused absences exceeded the limits in the AMC Guidelines, which provide that an employee may not have more than two unexcused absences in any twelve-week period. [37-9 (Willis Decl.), at ¶ 7.]

Plaintiff also contends that he "had legitimate reasons for his absences," including the fact that his brother was shot and that he was in the hospital. [40, at 9.] One might consider classifying such absences as unexcused harsh or unfair. But "[i]t is not the role of the court to determine whether an employer's expectations were fair, prudent, or reasonable. So long as its management decision was not a guise for a discriminatory purpose, [the Court] must respect that decision." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (internal citation omitted). Plaintiff has not presented sufficient evidence for a reasonable jury to conclude that the decision makers here classified these absences as unexcused as a guise for any discriminatory purpose. In any event, even if Plaintiff's absences on the day his brother was shot and on the day he was in the hospital

---

[9] Plaintiff actually was absent for more hours than reflected on the timesheet Danielwicz was examining when he testified that Plaintiff's absences were not excessive, as that timesheet did not include Plaintiff's partial day absences from May 2013 through August 2013.

were not counted against Plaintiff, he still would have violated the AMC Guidelines, as he still would have had more than two unexcused absences. Because Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that Plaintiff was meeting Defendant's legitimate employment expectations regarding attendance, the Court grants Defendant's motion for summary judgment on Plaintiff's discrimination claim.

ii.    *Similarly Situated Employees*

Defendant moves for summary judgment on the grounds that Plaintiff has not identified any similarly situated employees outside of Plaintiff's protected class who were treated more favorably. "To be similarly situated to another employee, [Plaintiff] must show that the employee is directly comparable in all material respects." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). Thus, the Seventh Circuit has made clear that a plaintiff may not survive summary judgment under the *McDonnell-Douglas* framework when he differs from his proffered comparators "in critical ways." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 927 (7th Cir. 2019). The Court considers "all relevant factors in making this determination, including whether the similarly situated employee held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014). Plaintiff identifies James E. Wright ("Wright Jr."), James A. Wright ("Wright Sr."), Scott Szelinski, and Steve Simmons as employees who were directly comparable to Plaintiff in all material respects.

Defendant argues that none of these comparators are directly comparable to Plaintiff because none of them were subject to a last chance order. Plaintiff responds that these comparators were not subject to a last chance order because they received preferential treatment by Defendant.

25

In other words, Plaintiff contends that he only was subjected to a last chance order because he was being discriminated against on account of his race. However, Plaintiff was subject to a last chance order because he was absent from work for five consecutive days without permission. Plaintiff has not identified any evidence indicating that any other laborer/hostler missed five consecutive days of work without permission. Thus, to the extent that Plaintiff contends that his being placed on a last chance order itself is evidence of discrimination, Plaintiff's argument fails.[10]

Furthermore, Defendant has identified other reasons why the comparators identified are not directly comparable in all material respects to Plaintiff.[11] Plaintiff notes that even though Wright Sr. had a total of 64.65 hours of unexcused absences from July 2012 through September 2012 and a total of 42.25 hours of unexcused absences from September 30, 2012 through December 29, 2012, he was not disciplined or subjected to an investigation. However, all of these absences occurred before the AMC was created. The AMC therefore could not have notified management of Wright Sr.'s absences during this period.

Plaintiff nonetheless asserts that it is reasonable to infer that management was alerted to the absenteeism of Wright Sr. because "abundances" of absences were reported to management by the payroll clerk. [40, at 10.] Plaintiff further contends that there is evidence that management reviewed attendance on a 90-day basis. [*Id.*] But Plaintiff mischaracterizes the cited evidence. Although Washington testified that absenteeism was to be reviewed every 90 days under shop manager Brad Robertson [41 (Stmt. of Add'l Facts), at ¶ 24], Plaintiff does not identify any evidence indicating that this was the policy while Willis was shop manager. In fact, the evidence

---

[10] Given that the last chance order was issued before August 25, 2013, any claim based on the issuance of a last chance order also would be time-barred.

[11] Plaintiff submitted an affidavit indicating that he reported to the same foreman as Wright Sr. and Wright Jr. [44-8 (Pl.'s Decl.), at ¶ 4.] Because there is no evidence indicating that this foreman was involved in the decision-making process, this information does not affect the Court's analysis.

before the Court indicates that such a policy was not in place while Willis was shop manager. According to Willis, there was no program in place for reviewing attendance records of employees while he was manager. [44-1 (Willis Dep. Tr.), at 13.] Attendance was reviewed when an issue was brought to the attention of management. [*Id.*] Gebhardt similarly testified that he would not review attendance records unless it was reported that there was an issue with an employee's attendance. [44-4 (Gebhardt Dep. Tr.), at 20.] For example, payroll clerks sometimes would notify Gebhardt if an employee had an abundance of absences. [*Id.* at 82.] After the AMC began operations, the AMC would alert management to attendance issues, typically by sending an email to management regarding each violation of a guideline. [*Id.* at ¶ 29.] This explains how management could have learned about Plaintiff's absenteeism after the AMC was initiated but may not have learned about Wright Sr.'s absenteeism pre-dating the AMC. Indeed, Plaintiff himself had missed (1) 58 hours of work between February 11 and April 30, 2012; (2) 58 hours of work between March 1 and May 31, 2012; (3) 87.5 hours of work between March 29 and June 26, 2012; and (4) 80.5 hours of work between January 1 and March 31, 2013. [45-2 (Yourich Ex. 23), at 44-47.] Yet Plaintiff was not disciplined for these absences. Based on the foregoing, Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that management was aware of Wright Sr.'s absences. The Court therefore concludes that Wright Sr. was not similarly situated to Plaintiff.

Whether Wright Jr. was similarly situated to Plaintiff presents a closer question. As with Wright Sr., the Court rejects Plaintiff's contention that it is reasonable to infer based on the evidence before the Court that management was aware of Wright Jr.'s absenteeism before Defendant implemented the AMC. Still, Wright Jr. had attendance problems post-dating the implementation of the AMC. On July 25, 2013, Gebhardt received a notification issued by the

AMC regarding Wright Jr.'s violation of the attendance guidelines on July 25, 2013. [41 (Stmt. of Add'l Facts), at ¶ 38.] In the 90-day period preceding the notification, Wright Jr. had 49 hours of absences that were not covered by PTO, sick time, or other protected leave. [*Id*.] Wright Jr. received a non-disciplinary letter of caution from Gebhardt on or about August 2, 2013 in relation to these absences. [*Id*. at ¶ 37.] But no investigation was conducted into whether Wright Jr. had excessive absenteeism in 2012 or 2013. [*Id*.] Wright Jr. received a 5-day deferred suspension for his second AMC violation. [*Id*. at ¶ 39.] Although the AMC issued a notice of a third violation on April 1, 2015, no action was taken because Defendant claims to have missed the 21-day deadline to issue a notice of investigation. [*Id*.] Plaintiff's brief implies that Defendant intentionally missed the 21-day deadline to issue a notice of investigation, but there is no evidence supporting that conclusion. Plaintiff does cite to an email in which the AMC issued multiple reminders to Brian Tracy about setting up an investigation. [45-2 (Yourich Ex. 24), at 52-53.] But Plaintiff does not identify any reason why Tracy would have intentionally missed the 21-day deadline. Tracy does indicate that he would be setting up the investigation with Gebhardt, but there is no evidence indicating that Gebhardt caused Defendant to miss the deadline. In the final email in the chain, Tracy states: "We missed the dead line [sic] and only could bring [Wright Jr.] in and talk to him. Something in PAP did not work and we went past the 21 days we are allowed to serve investigation notice." [*Id*. at 52.] The parties do not cite evidence elaborating on the problem Tracy referenced when he stated that "[s]omething in PAP did not work." Without any evidentiary basis for concluding that Gebhardt or Tracy (or anyone else for that matter) intentionally missed the 21-day deadline for starting an investigation, no reasonable jury could reach that conclusion. Furthermore, Willis—who made the initial recommendation to terminate Plaintiff's employment following the August 2013 hearing—no longer was the Manager of

Woodcrest Shop when the second and third notices of violations were issued by the AMC. [36 (Stmt. of Facts), at ¶ 10.]

Plaintiff also argues that Plaintiff should have been progressively disciplined, as was done with Wright Jr. The applicable AMC guidelines allowed for progressive discipline of employees who did not have active discipline. Specifically, the CA Guidelines stated that Defendant would "consider the employee's entire disciplinary record when issuing discipline for an established violation of these Guidelines" and provided recommended progressive corrective actions for employees who had no existing discipline on their records. [*Id*. at ¶ 27.] Genhardt, Yourich, and Willis all testified that progressive discipline was allowed under the AMC guidelines only for employees who had no prior disciplinary history whatsoever. [40, at 12.] But Plaintiff contends that there is conflicting evidence on this point because—according to Plaintiff—"Danielwicz testified that 'active discipline; was discipline under the attendance guidelines." [40, at 13; 41 (Stmt. of Add'l Facts), at ¶ 7.] However, Plaintiff mischaracterizes Danielwicz's testimony. Danielwicz testified that the guidelines relate to discipline for attendance violations, not other violations such as discipline for running a switch. [44-6 (Danielwicz Dep. Tr.), at 28.] He did not testify that active discipline was discipline under the attendance guidelines only. Based on the foregoing, the Court concludes that Wright Jr. also is not similarly situated to Plaintiff.

Plaintiff also identifies Scott Szelinski and Steve Simmons as non-African-American comparators. With respect to Szelinski, Plaintiff argues that he was treated more favorably because (1) two AMC notifications regarding Szelinski's absenteeism were ignored by Gebhardt, and (2) Gebhardt and Yourich merely gave Szelinski a thirty-day suspension after learning that Szelinski had lied to the AMC about his absences to avoid discipline. However, Plaintiff has not established that the first two AMC notifications regarding Szelinski were ignored. Although

Szelinski was not disciplined for his first violation, it is not true that the violation was completely ignored. Plaintiff admits that Szelinski received counseling after management received notice of his first violation of the Guidelines on or about November 17, 2014. Furthermore, there is no evidence that Szelinski had any coaching or discipline for attendance at the time the first AMC notice was issued. This is unlike Plaintiff, who did have prior disciplinary history, including the Last Chance Order, at the time his first AMC notice was issued. With respect to the thirty-day suspension, Defendant scheduled an investigation hearing for Szelinski on June 16, 2015 relating to his absences and purported false statements to the AMC. After Szelinski waived the investigation hearing, he was issued a thirty-day suspension. However, there is no evidence indicating that Plaintiff ever requested a waiver of investigation. And again, Willis was no longer shop manager at the time the AMC issued notices regarding Szelinski.

That leaves Steve Simmons. In 2013, Willis recommended that another laborer/hostler Steve Simmons be terminated for attendance issues. [36 (Stmt. of Facts), at ¶ 66.] Simmons was terminated effective January 28, 2013. [*Id.*] Simmons was in Willis's and Gebhardt's reporting structure. [41 (Stmt. of Add'l Facts), at ¶ 45.] Although Simmons was terminated for attendance issues, Plaintiff contends that Simmons was treated more favorably because Willis talked to Simmons and gave Simmons the opportunity to improve his attendance, even though Simmons had attendance problems going back to 2007. But Willis never spoke with Plaintiff about his attendance before Plaintiff's employment was terminated. And, unlike Plaintiff, Simmons was not subject to a last chance agreement. [36 (Stmt. of Facts), at ¶ 66.] Simmons therefore is not similarly situated to Plaintiff.

iii.     Pretext

Even if Plaintiff had met his prima facie burden under *McDonnell Douglas*, Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that Defendant's proffered reason for terminating Plaintiff's employment was pretextual. Plaintiff argues that the fact that he was treated differently than others by Defendant establishes pretext. As discussed above, Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that he was treated differently than similarly situated employees with respect to his termination.

But Plaintiff identifies other ways in which he believes he was treated differently by Defendant. First, Plaintiff cites to the fact that Adcock and Swanson allegedly ran through switches—like Plaintiff—but were not suspended like Plaintiff. However, Plaintiff does not identify admissible evidence sufficient to establish that Adcock actually did run a track. And although Gebhardt issued a letter of caution to Swanson regarding the need to pay attention to all switches prior to proceeding through, this letter is not sufficient to establish that Swanson ran through a switch and damaged it, as Plaintiff had. Plaintiff's evidence regarding Adcock and Swanson allegedly running a switch therefore is not persuasive evidence of pretext.[12]

Plaintiff also contends that the fact that Gebhardt pulled him out of service before the investigation hearing on the running the switch incident is evidence of pretext. Under Defendant's policy, an employee could be suspended pending a hearing only if the incident involved alcohol or drugs, theft of company property, gross insubordination, vicious conduct, or if the results of

---

[12] To the extent that Plaintiff asks that the Court conclude that it was improper for Defendant to consider his thirty-day suspension in determining what action to take following the investigation hearing, Plaintiff cannot revive his otherwise time-barred claim by challenging effects of an allegedly discriminatory decision outside of the statute of limitations. *Dasgupta v. Univ. of Wisc. Bd. Of Regents*, 121 F.3d 1138, 1140 (7th Cir. 1997) (allowing untimely discrimination claim to be "revived by pointing to effects within the limitations period of unlawful acts that occurred earlier" would essentially "unravel the statute of limitations"); see also *Del. State College v. Ricks*, 449 U.S. 250, 258 (1980).

drug or alcohol screens were pending. None of these conditions applied to Plaintiff. Still, there is no indication that the decision to pull Plaintiff from service played any role in the decision terminate Plaintiff's employment. Furthermore, the fact that Defendant did not follow its policy is not by itself evidence of any improper motive. *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) ("So long as [Plaintiff's] sex did not influence [the] decision to fire her, that decision—even if made by misapplying firm policy—would not violate Title VII.").[13]

Finally, Plaintiff testified that a machinist named "Charlie" told Plaintiff that Gebhardt stated that he was "getting [Plaintiff's] black ass out of here." Because Gebhardt was involved in the decision-making process affecting the challenged employment actions, his statements qualify as admissions of a party opponent and therefore are not hearsay. *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 951 (7th Cir. 1998). However, because there is no indication that "Charlie" was a managerial employee or otherwise involved in making the relevant decisions, his statements do not qualify as admissions of a party opponent and therefore are hearsay. *Id*. ("Because the out-of-court statements concerned matters outside of the declarants' scope of employment, we conclude that the district court erred in allowing this testimony into evidence."). Plaintiff cannot rely on such hearsay to oppose summary judgment. *Jackson v. City of Peoria, Illinois*, 825 F.3d 328, 330 (7th Cir. 2016). Because Plaintiff cannot establish that Defendant's reason for terminating Plaintiff's employment was pretextual, the Court grants Defendant's motion for summary judgment on Plaintiff's race discrimination claim for this reason as well.

---

[13] The Court recognizes that pretext might be established by showing that the Defendant did not follow its own policy with respect to the relevant adverse action. However, Plaintiff cites no authority supporting the proposition that a plaintiff claiming retaliation may establish pretext by showing any failure to follow any policy with respect to the plaintiff, at any point in time after the plaintiff engaged in statutorily-protected activity.

B.    **Retaliation Claim**

Defendant moves for summary judgment on Plaintiff's retaliation claim.  Plaintiff also seeks to establish his retaliation claim through the *McDonnell-Douglas* framework, which, in the retaliation context, requires that Plaintiff establish "that (1) he engaged in a protected activity, (2) he performed his job duties according to his employer's legitimate expectations, (3) he suffered an adverse action, and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (citation omitted).  "If the plaintiff can establish his prima facie case with this indirect method, the burden then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action." *Id.* (citing *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998)).  "If the employer does so, the burden shifts back to the employee to prove that the employer's stated reason is mere pretext." *Id.* (citing *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)).

Defendant argues that Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that he engaged in statutorily-protected activity.  Plaintiff responds that he has identified evidence establishing that "[e]veryone involved in the decision to terminate Plaintiff read the transcript of his April 11, 2013 [hearing] during which he complained about being treated differently than Caucasian employees Jerry Adcock and Tim Swanson." [40, at 15.]  Although the evidence cited by the parties indicates that Plaintiff believed that he was being treated differently than Caucasian employees Jerry Adcock and Tim Swanson, Plaintiff does not cite to any evidence indicating that this was because of his race.  To the contrary, Plaintiff made a statement indicating that he believed that he was being discriminated against because of his past attendance infractions. "Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex,

race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citing *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997)). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.* (citations omitted).

Plaintiff also argues that he engaged in statutorily protected activity in May or June of 2013 when he raised concerns that he was being targeted because of his race with Gebhardt. However, Plaintiff did not include any allegations relating to this conversation in his complaint. Rather, in his complaint, Plaintiff purported to base his retaliation claim on (1) his complaint to Human Resources, and (2) his testimony during the April 11, 2013 investigation hearing. [1 (Compl.), at ¶¶ 14-16.] "[P]laintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)) (internal quotation marks omitted). The Court therefore agrees that Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that Plaintiff engaged in statutorily protected activity.

The Court also agrees that Plaintiff has not identified sufficient evidence for a reasonable jury to find a causal link between any protected expression and the termination of his employment. "To prevail on a retaliation claim requires 'proof that the desire to retaliate was the but-for cause of the challenged employment action.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). To establish causation, Plaintiff invokes the *McDonnell-Douglas* burden-shifting framework, which allows Plaintiff to proceed without proving a direct causal link. However, as discussed above, Plaintiff fails to satisfy the requirements of *McDonnell-Douglas*. Accordingly, the Court

grants Defendant's motion for summary judgment on Plaintiff's retaliation claim on that basis as well.

## IV.    Conclusion

For the reasons set forth above, Defendants' motion for summary judgment [34] is granted. Judgment shall be entered in favor of Defendant Illinois Central Railroad Company and against Plaintiff.    Although CN Transportation Limited is listed as a Defendant on the docket, CN Transportation never answered or otherwise appeared in this matter.    Plaintiff is given until January 14, 2020 to file a status report apprising the Court of the status of his claims against that Defendant.

Dated: December 30, 2019

_____
Robert M. Dow, Jr.
United States District Judge